AE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PEGGY MANKOWSKI,                    )
                                    )
                 Plaintiff,         )
                                    )
      v.                            )     No.  04 C 6603
                                    )
MEN'S WEARHOUSE,                    )
                                    )
                 Defendant.         )

## MEMORANDUM OPINION AND ORDER

Peggy Mankowski ("Mankowski") has brought a two-count
Complaint against her ex-employer Men's Wearhouse, Inc. ("Men's
Wearhouse"), alleging both sexual harassment and retaliation in
violation of Title VII of the Civil Rights Act of 1991
("Title VII," 42 U.S.C. §§2000e to 2000e-17).[1]  After the
completion of discovery, Wearhouse moved for summary judgment on
both counts and requested "attorney's fees, costs and expenses"
under both 28 U.S.C. §1927 ("Section 1927") and Title VII's fee-
shifting provision, Section 5(k).  For the reasons articulated
here, this Court (1) grants Wearhouse's summary judgment motion
as to both the harassment and retaliation claims, (2) defers
ruling on Wearhouse's motion for the payment of attorney's fees
and expenses and (3) awards Wearhouse all other statutory costs.

### Summary Judgment Standards

Familiar Fed. R. Civ. P. ("Rule") 56 principles impose on

---

[1] All references to Title VII provisions will take the form
"Section --," omitting the prefatory "42 U.S.C. §20003.)

movant Wearhouse the burden of establishing the lack of a genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must "consider the evidentiary record in the light most favorable to the non-moving party...and draw all reasonable inferences in his favor" (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)).[2] That said, to avoid summary judgment a nonmovant still "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)).

In the end, however, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). What follows is a summary of the facts viewed in the light most favorable to Mankowski, together with the required favorable inferences, but only so long as those facts and inferences are

---

[2] In that respect this District Court's LR 56.1 is designed to facilitate the resolution of summary judgment motions by calling for the movant's evidentiary statements and the nonmovant's itemized responses to such statements (in each instances with record citations), thus highlighting the existence or nonexistence of factual disputes. This opinion cites to those initial statements as "W. St. ¶--" and "M.St. ¶--" respectively, to Mankowski's statement of additional facts as "M. Add.St. ¶--" and to Wearhouse's response to that statement as "W. R.St. ¶--." Where an assertion in either party's LR 56.1 statement is undisputed, this opinion cites only to the original statement. Those same "W." and "M." references will also be used to refer to each party's memorandum of law ("Mem."), to Wearhouse's memorandum ("R. Mem.") and to Mankowski's deposition ("Dep.").

2

supported by record evidence.[3]

## Background

In April 2001 Mankowski began working as a sales associate in Wearhouse's Bloomingdale store[4] (W. St. ¶5). During her orientation and training period Mankowski received, reviewed and became familiar with Wearhouse's Anti-Discrimination and Harassment Policy and Complaint Procedures (the "Policy")(id. ¶¶16, 23-24). Among other things, the Policy--which was additionally posted in the stores and online--specifically prohibited both (1) sex-based discrimination and harassment and (2) retaliation for reporting such discrimination or harassment (id. ¶¶17, 22, 25-26). It also gave examples of prohibited

---

[3] As Wearhouse notes (W. R.St. n. 1), a troubling number of Mankowski's LR 56.1 submissions are not in fact competently supported by record evidence. This Court--entitled to strict compliance with LR 56.1 (among the numerous Court of Appeals opinions so holding, see, e.g., Ammons v. Aramark Unif. Servs., Inc., 368 F.3d 809, 817 (7th Cir. 2004))--has disregarded any such defective submissions. Some particularly egregious examples are hereafter highlighted in the Background section. That said, however, this Court also observes that--although Wearhouse's violations are hardly as serious or as common as Mankowski's-- some of its own LR 56.1 filings are less than exemplary: see, e.g., W. St. ¶98 (making a factual claim that is unjustified, not only because of the absence of support for the claim in the cited deposition pages, but also due to the presence of an affirmative statement contradicting that claim in later--though uncited-- pages of that deposition) and W.R.St. ¶28 (offering no record evidence for the claim made there--indeed, citing to nonexistent pages of a deposition). As in Mankowski's case, factual statements that Wearhouse fails to support properly have also been disregarded.

[4] All locations referred to in this opinion are here in Illinois.

3

conduct, provided for disciplinary action and outlined both the reporting and investigation procedures (id. ¶¶18-22).

In January 2002 Mankowski was transferred to Wearhouse's Schaumburg store, and by late September or early October of that year she had become a "tuxedo representative," a post that primarily involved handling the store's tuxedo rental business (W. St. ¶¶6-8). In addition Mankowski was able--at least while at the Schaumburg store--to "take customers off the floor" and thereby earn "extra money" in commissions (M. Add.St. ¶38).

During September and October 2002 store manager Paul Alberts ("Alberts") and assistant store manager Robert Nowakowski ("Nowakowski")--each of whom had received both initial and ongoing training as to the Policy (W. St. ¶26)--engaged in a variety of sexually-charged conduct directed at Mankowski. Although the volume of such activity on Alberts' part was more extensive, both of them offended in that respect.

For example, Alberts repeatedly touched or rubbed Mankowski's back (W. St. ¶29; M. Add.St. ¶7), repeatedly asked to rub her feet and told her that she had "cute feet," that he "loved her feet" and that her "feet dr[o]ve him crazy" (W. St. ¶¶34-35; M. Add.St. ¶¶8, 10). When Mankowski would tell Alberts that she was "taking care" of a customer, Alberts would often respond--with a smile--"I bet you take care of them real good, don't you" (W. St. ¶43). On one occasion, upon hearing that

4

Mankowski had taken the tuxedo representative position, Alberts grabbed her arms and kissed her on the mouth (id. ¶41). Alberts also repeatedly asked to take Mankowski out on what she considered to be "dates" and intimated that, although married, he was interested in establishing a more serious relationship with her (although it is not clear whether Alberts ever used the specific terms "relationship," "date" or "take out") (id. ¶¶37-39).

Mankowski also complained of two incidents involving Nowakowski. In one instance, when Mankowski was taking shoehorns out of a plastic bag, Nowakowski commented that they "looked like some kind of sexual device" (W. St. ¶51). In the other, when Mankowski told Nowakowski that she had almost not come to work that day due to illness, he replied, "Well, if you hadn't come in, I'd have to pull my pants down and spank you" (id. ¶52).

Despite her identification of those occurrences, Mankowski has offered nothing to indicate that they interfered with her ability to do her job or to finish her shift. More importantly, Mankowski never told Alberts or Nowakowski that their conduct made her uncomfortable or was inappropriate--though that does not of course excuse the conduct (id. ¶¶56-57).

On October 22, 2002 Mankowski sent an email to her Regional (Area) Manager Dwight Haygood ("Haygood") and to the Schaumburg store's District Manager William Mercurio ("Mercurio") that

contained a postscript stating that an unnamed co-worker had kissed her (W. St. ¶62). Mercurio responded by setting up a meeting with Mankowski the very next day (id. ¶63). Although Mankowski characterizes Mercurio as apparently annoyed and even angered by the complaint, he promptly instructed employee relations representative Victoria Johnson ("Johnson") to investigate it (M. Add.St. ¶¶18-20).

On October 24, dissatisfied with her meeting with Mercurio and worried about co-worker fallout from her complaint, Mankowski again communicated with Haygood, who arranged to meet her the next day (M. Dep. 81-82). During that October 25 meeting Mankowski, expressing her apprehension about continuing to work in Schaumburg after making her complaint, asked Haygood to transfer her to another store (W. St. ¶70).[5] That same day

---

[5] Mankowski's LR 56.1 submissions regarding her transfer provide a good example of the kind of evidentiary abuse in which she has engaged too often. First, despite unequivocally admitting in her response to Wearhouse's statement of facts that it was she who requested the transfer (M. St. ¶70), Mankowski nevertheless later attempts to "dispute" that admission (id. ¶85). But that "dispute"--like the portion of Mankowski's deposition upon which it relies (M. Dep. 86-87)--never actually denies that it was she who initiated the transfer: Instead it merely says that she made the request because she feared that "it would be hard for her having to work in the store after she had complained" (M. St. ¶85). Yet Mankowski goes on to assert in her statement of additional facts that the transfer was in fact "initiated" by Mercurio (M. Add.St. ¶34). Not only does the evidence that Mankowski cites offer absolutely no support for that contention, but such a claim impermissibly contradicts her own earlier deposition testimony. In the end, nothing in Mankowski's LR 56.1 filings or in the cited portions of her deposition suggest that Wearhouse transferred Mankowski for any

6

Haygood offered, and Mankowski thereafter accepted, a position in Wearhouse's Wheaton store (id. ¶¶71-72). Haygood, like Mercurio before him, also instructed Johnson to begin an investigation (id. ¶75). On October 29 Mankowski began work at the Wheaton store (M. Add.St. ¶22), where she experienced no further harassment (W. St. ¶74).

Within days after Mankowski's October 23 and 25 conversations with Mercurio and Haygood, Johnson began the ordered investigation of Mankowski's complaints. On October 29 Johnson called her and questioned her about the actions of Alberts and Nowakowski (M. Add.St. ¶23). Johnson had no further contact with Mankowski (id. ¶24), but she also interviewed Nowakowski, and employee relations representative Amy Krapalski ("Krapalski") conducted at least one interview with Alberts (W. St. ¶78; M. Add.St. ¶¶27-28).[6] Other than Alberts' kiss (which Mankowski described as "pretty brief" (M. Dep. 53) and Alberts testified was just "a spur of the moment congratulatory type of thing" (W.St. ¶42)), Alberts and Nowakowski flat-out denied each of Mankowski's allegations, and Johnson was unable otherwise to corroborate them (W. St. ¶¶79-80).

---

reason other than because she asked it to do so.

[6] Although Mankowski contends there were seven such contacts between Krapalski and Alberts (M. Add.St. ¶28), the portion of the record to which she cites (Alberts Dep. 27) offers no support whatever for that assertion.

7

Nevertheless, on November 16 Mercurio and Haygood issued a disciplinary warning or "Performance Development Plan" ("PDP") to each of Alberts and Nowakowski, instructing them to refrain from making inappropriate comments or engaging in any conduct that could be construed as sexual harassment (W. St. ¶82). Those PDPs further warned that any failure to comply would result in disciplinary action, up to and including demotion or termination of employment (id. ¶83).

Meanwhile Mankowski's move to the Wheaton store caused or led to a number of what she labels as negative changes in her employment conditions, including a lengthened commute, an altered commissions policy, a change in job title, one last minute schedule change and a disciplinary warning. But analysis reveals that none of those potential harms, either singly or collectively, can suffice to create liability for Wearhouse.

Thus despite Mankowski's having represented to Haygood that she lived in Batavia--closer to Wheaton than to Schaumburg--the transfer to Wheaton apparently increased her daily commute by 25-30 minutes (M. Add.St. ¶¶35-36). That inconvenience, however, cannot reasonably be placed at Wearhouse's doorstep.[7]

_____

[7] Mankowski attempts to "dispute" the issue of her residency (M. St. ¶88), but she fails to do so in relevant terms: that is, in terms of Wearhouse's reasonable understanding on that subject. It may well be true that, as Mankowski claims, she did live in Schaumburg rather than Batavia at the time of her transfer (id.), but Wearhouse does not seek to rely on where Mankowski actually lived at that time (W. St. ¶88). Instead it merely states that

8

Next, Mankowski was told that, unlike her situation in Schaumburg, in Wheaton she would not generally be able to "take customers from the floor" and thereby earn extra commissions (id. ¶38; M. Dep. 102-03). But in practice she did actually earn commissions in Wheaton--at least until February 2003, when Wearhouse engaged in a region-wide (if not company-wide) consolidation of the tuxedo representative and sales associate positions into a single new position, the commissionless "customer service associate" ("CSA") (W. St. ¶¶10, 12, 92-93). In fact, until that consolidation Mankowski actually earned more in commissions in Wheaton than she had in Schaumburg (id. ¶¶90, 92).[8]

Mankowski next complains that on July 8, 2003 store manager Robert Trybalski ("Trybalski") made a last minute change to her schedule for that day because he needed coverage (id. ¶99): Instead of working a 10 a.m. to 6 p.m. shift, Mankowski was

---

Mankowski told Haygood that she lived in Batavia (id.), a statement that Mankowski's own deposition clearly supports (M. Dep. 91). And that bars any claim that Wearhouse injured her in that respect.

[8] Despite her specific admission that she earned $0.87 an hour in commissions in Wheaton as compared to only $0.64 per hour in commissions in Schaumburg (W. St. ¶90), Mankowski nevertheless contends that she did not "actually earn[ ] more in commissions after the transfer" (M. St. ¶89). She attempts to support that incongruous claim by arguing that she "did not have as many commission opportunities to engage in" (M. St. ¶89; M. Add.St. ¶40). Even if that is true (an assertion for which she offers no evidentiary support), her actual increase in hourly commission earnings in Wheaton saps that claim of probative force.

9

assigned to a 10 a.m. to 9 p.m. shift (id. ¶96). Some number of Mankowski's co-workers had worked that longer shift in the past,[9] and at least around that time Trybalski had also begun changing other employees' shifts at the last minute (M. Dep. 119; W. St. ¶101).

Finally, at the end of July 2003 one of Mankowski's co-workers complained to District Manager Lonzell Tate ("Tate") that Mankowski (1) had remained on a personal phone call instead of helping a customer and (2) in the course of that call had made negative comments about Wearhouse in the presence of the customer (W. St. ¶107). While Mankowski admitted to Tate that she had not helped the customer,[10] she denied making the negative comments (M. Dep. 127-31). Although other employees had received personal calls at work without reprimand, Tate issued Mankowski a PDP (M.

---

[9] Each party makes claims about whether other employees were or were not <u>required</u> to work that longer shift (W. St. ¶98; M. St. ¶98; M. Add.St. ¶44). Neither really proves its or her position-- Wearhouse mischaracterizes the record, and Mankowski offers only speculation (M. Dep. 119, 121). In all events, this minor tempest does not even begin to fill the proverbial teapot.

[10] Mankowski's response to Wearhouse's statement of facts denies that she made such an admission (M. St. ¶109), claiming instead that she admitted only that she had <u>taken</u> the call, not that she had ignored a customer in doing so (<u>id</u>.). In that respect, the particular pages of Mankowski's deposition to which Wearhouse cites (M. Dep. 132-33) do not say that Mankowski admitted that she did not help the customer. But Wearhouse's claim <u>is</u> clearly supported by the immediately preceding pages of the deposition, in which Mankowski admits both that she refused to assist a customer while taking a personal phone call and that she admitted as much to Tate (<u>id</u>. 127-31).

10

Add.St. ¶47; W. St. ¶107). While the PDP warned that further like conduct would lead to other disciplinary action, it did not in fact result in a loss of pay, a demotion, a change in position or "anything else negative" (W. St. ¶108).

On or about November 7, 2003 Mankowski voluntarily resigned her employment with Wearhouse (W. St. ¶13). Nearly a year later, on October 13, 2004, she filed this suit.

On June 27, 2005, in the midst of discovery, Wearhouse's lawyer sent Mankowski's lawyer a letter urging her to dismiss Mankowski's claims, detailing what were perceived to be serious flaws in the claims and warning that Wearhouse would consider requesting fees and costs if Mankowski proceeded with the litigation (W. R.Mem. Tab A).[11] Mankowski did not drop the case, though, so at the close of discovery Wearhouse moved for summary judgment on both of Mankowski's claims.

After this Court had read Wearhouse's initial memorandum in support of its motion, and before Mankowski was due to file her response, this Court issued an October 14, 2005 memorandum order that commented on the apparent strength of Wearhouse's initial presentation and warned Mankowski of the possibility of fee shifting if Wearhouse should prevail and if her own case should

---

[11] That 4-1/2 page single-page letter was not just a generalized "drop it or else" threat. Wearhouse's counsel provided chapter and verse in both factual and legal terms, making arguments that later found their way into the company's summary judgment briefing.

11

prove "actually or legally frivolous." Again Mankowski
persisted. this time by contesting Wearhouse's summary judgment
motion.

## Hostile Work Environment

Section 2(a)(1) says that no employer may "discriminate
against any individual with respect to his compensation, terms,
conditions or privileges of employment, because of such
individual's race, color, religion, sex or national origin."
That prohibited conduct includes the creation of a hostile work
environment attributable to sexual harassment (McPherson v. City
of Waukegan, 379 F.3d 430, 437-38 (7th Cir. 2004)). And to
prevail on such a claim a plaintiff "must establish that: (1) she
was subjected to unwelcome sexual advances, requests for sexual
favors, or other verbal or physical conduct of a sexual nature;
(2) the conduct was severe or pervasive enough to create a
hostile work environment; (3) the conduct was directed at her
because of her sex; and (4) there is a basis for employer
liability" (Quantock v. Shared Mktg. Servs., Inc., 312 F.3d 899,
903 (7th Cir. 2002)(per curiam)).[12]

_____

[12]   Although the text has spoken in terms of what a
plaintiff must "establish," it must be remembered that
plaintiff's burden on a Rule 56 motion is only the lesser one of
identifying a genuine issue of material fact as to an essential
issue.   This Court has of course applied that less onerous
standard, even though its shorthand references to the principles
as stated in the caselaw echo the more demanding locution of the
cases.

Although Wearhouse disputes only the second and fourth of those elements (W. Mem. 4-11), this opinion can be even more limited in scope, focusing exclusively on the latter. That is so because, as the ensuing discussion demonstrates, Wearhouse has successfully established an affirmative defense as to any liability for any hostile work environment to which Mankowski was subjected.[13]

Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775 (1998) have established that an employer is vicariously liable for an actionable hostile work environments when that environment is "created by a supervisor with immediate (or successively higher) authority" over the employee (Ellerth, 524 U.S. at 765, repeated in Faragher, 524 U.S. at 807). But those same cases also teach that so long as no "tangible employment action" is taken, an employer can raise an affirmative defense (the "Ellerth-Faragher defense") to its potential liability by showing (Ellerth, 524 U.S. at 765, repeated in Faragher, 524 U.S. at 807):

> (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.[14]

---

[14] [Footnote by this Court] It may be noted parenthetically that this Court's November 9, 2004 memorandum order struck that affirmative defense from Wearhouse's responsive

13

"Tangible employment action" refers of course to an adverse action, and what has already been said negates that conclusively. Wearhouse's reaction to Mankowski's first mention of harassment was swift: It immediately honored her request to be transferred to the Wheaton store, thus removing her from the environment about which she complained--and indeed that transfer spelled the end of any sexual harassment. Lastly on that score, it is only necessary to recall--not to repeat or even to reread--what has been said in the Background section to see that Mankowski's claimed beefs about that transfer and its consequences are empty of merit--they vanish more quickly than the smile on the Cheshire Cat. Actions that simply "make[ ] an employee unhappy" are not enough to trigger employer liability (Murray v. Chicago Transit Auth., 252 F.3d 880, 888 (7th Cir. 2001), quoting Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)).[15]

So the analysis can more forward to the Ellerth-Faragher defense itself. Its first element comprises dual demands imposed on the employer: the exercise of reasonable care (1) to prevent

pleadings due to its violation of Rule 8(c). In that circumstance Wearhouse could not of course be said to have waived (or forfeited) the defense. But in any event Mankowski has raised no objection to its assertion.

[15] As if that were not enough (and it is), it must be remembered that the affirmative defense at issue here is barred only by "tangible employment action" that is undertaken by the harasser (Johnson v. West, 218 F.3d 725, 731 (7th Cir. 2000)), and that was unquestionably not the case here.

14

sexual harassment and (2) to correct promptly any such harassment that does occur (see, e.g., Shaw v. AutoZone, Inc., 180 F.3d 806, 811-12 (7th Cir. 1999)).

As to the former requirement, Wearhouse's appropriate and well-established anti-harassment policy fills the bill. In that respect Cerros v. Steel Techs., Inc., 398 F.3d 944, 954 (7th Cir. 2005) follows Shaw, 180 F.3d at 812 in holding that an employer's adoption of such a detailed policy and its distribution to employees "establishe[s], as a matter of law, that [the employer] exercised reasonable care to prevent sexual harassment."

Although Mankowski cannot (and does not attempt to) quarrel with that proposition directly, she seeks to undercut it by a brief attack on what she views as the inadequacy of Wearhouse's investigation and of its sanctions imposed on the alleged harassers (M. Mem.7). But that has an inherent logical flaw: Even though this Court is required to accept Mankowski's version of events for Rule 56 purposes, it must be remembered that Wearhouse was not obligated to do so for purposes of its investigation (this is in a sense analogous to the well-established principle that it is the honesty, and not necessarily the correctness, of the employer's beliefs that controls in the pretext inquiry).

With Wearhouse's investigator having encountered a sharply-contested "he said, she said" situation as to the asserted

incidents about which Mankowski complained, it would be wholly
improper for this Court (let alone for Mankowski) to second-guess
Wearhouse's decision to issue a sharp warning to, rather than to
impose a more draconian sanction (suspension? firing?) on,
Alberts or Nowakowski. In short, the first prong of the Ellerth-
Faragher requirements has unquestionnably been satisfied.

As for the second requirement (that of corrective action),
M. Mem. 7-8 points to much the same material in an effort to
argue that Wearhouse failed to exercise resonable care in that
regard -- but she is wrong both legally and factually. On the
legal front Cerros, 398 F.3d at 954 teaches that a prompt
response to complaints of harassment is a "hallmark of reasonable
corrective action." And in factual terms, within three days
after Mankowski first voiced any complaint--to both Mercurio and
Haygood--on October 22, 2002, both Mercurio and Haygood had met
with her individually, and each had instructed Johnson to begin
an investigation of those complaints. By October 29 (just a week
after Mankowski first reported her grievance) she had been
transferred, as per her request, to the Wheaton store. By any
definition--indeed, even by Mankowski's (M. Mem. 8)--Wearhouse's
corrective response was prompt. And as already stated here, that
put and end to any harassment.

As to the remaining component of the Ellerth-Faragher
defense, the employer must show that the plaintiff "unreasonably

failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise" (Ellerth, 524 U.S. at 765). As Faragher, 524 U.S. at 806-07 explained, that places upon employees a duty to mitigate damages and bars recovery for harassment that could have been avoided had the employer been given an opportunity to address it.

Here it is undisputed that Wearhouse had a well-publicized and comprehensive harassment policy in place (see Faragher, id. at 807-08), that Mankowski was well aware of it and that she had received specific training regarding its complaint procedures. Nevertheless, despite the September 2002 onset of what she claims to have been repeated harassment, Mankowski did not avail herself of any of the alternative reporting procedures until she sent her October 22, 2002 email to Mercurio and Haygood. Nor do Mankowski's briefs offer any explanation for that failure to report her harassment (or relatedly, seek to explain how she can fairly criticize Wearhouse's swift reaction time when she herself did not complain with anything even approaching such swiftness).

Accordingly this Court holds that Mankowski failed to fulfill her duty to mitigate any damages that she might have sustained from ongoing harassment. Simply put, she cannot recover for harms that--given Wearhouse's immediate and effective response once it was finally informed of the harassment--would surely have been avoided had the initial harassment been brought

to Wearhouse's attention promptly (see, e.g., this Court's opinion in Shaba v. IntraAction Corp., No. 02 C 5173, 2004 WL 42350, at *5 (N.D. Ill. Jan. 6)).

## Retaliation

With Mankowski's hostile working environment claim having been thus dispatched, that leaves only her claim that Wearhouse violated Title VII by subjecting her to a number of adverse employment actions in retaliation for her complaint of sexual harassment. To that end Mankowski has chosen to employ the familiar indirect or "burden shifting" method that our Court of Appeals has adapted from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) to the retaliation arena (Stone v. City of Indianapolis Pub. Utils. Div., 281 F.3d 640, 642 (7th Cir. 2002)), followed in such cases as, e.g., Rhodes v. Ill. Dep't of Transp., 359 F.3d 498, 508 (7th Cir. 2004)).

Despite the clarity of that framework, the regularity with which if is recited in the caselaw (see, e.g., in addition to Stone and Rhodes, Haywood v. Lucent Techs., Inc., 323 F.3d 524, 531 (7th Cir. 2003), Hilt-Dyson v. City of Chicago, 282 F.3d 456, 465 (7th Cir. 2002) and Oest v. Ill. Dep't of Corrs., 240 F.3d 605, 612 (7th Cir. 2001)) and the fact that Wearhouse expressly set out the method's requirements in its initial summary judgment memorandum (W. Mem. 11-12) and, indeed, in its lawyer's earlier June 27, 2005 letter to Mankowski (W. R.Mem. Tab A at 3-4),

Mankowski's counsel has inexplicably misapprehended the entirety of what the indirect method requires of her. Thus Mankowski's Mem. 8, in paraphrasing the method as set out in Thomas v. Habitat Co., 213 F.Supp.2d 887 (N.D. Ill. 2002), stops well short of completeness, for in that case Judge Bucklo properly went on to the next stage of the analysis (id. at 895-96), as Mankowski has wholly failed to do.

To be sure, Mankowski at least attempts to establish a prima facie case regarding a number of alleged retaliatory actions: her transfer to the Wheaton store (where her commute was lengthened and she claims--inaccurately--that her "commission opportunities were reduced, if not eliminated"), a single last minute change of a particular day's work schedule (lengthening it by three hours) and the issuance of a disciplinary warning (M. Mem. 9-10). But quite apart from the obvious weakness of those matters in substantive terms, Mankowski advances no argument at all to address the final step of the indirect method: her required demonstration that Wearhouse's stated reasons for those purportedly adverse employment actions were in fact pretextual.

Little wonder, for the evidentiary record tendered to this Court not only fails to support any notion of pretext: It actually scuttles any such notion. Because Mankowski thus did not--and on the evidence could not--raise a genuine question of fact as to pretext, her retaliation claim does not survive

summary judgment either.

For example, not only does Mankowski fail to tender any affirmative evidence of pretext in Wearhouse's decisions to transfer her out of Schaumburg in general, and to Wheaton in particular, but her own admission squarely defeats any such possible contention. As already stated, Mankowski acknowledges that it was she who requested the transfer out of Schaumburg. How then can it be argued in good faith that the transfer initiated by Mankowski herself had an illicit retaliatory motive? And relatedly, Haygood's decision to transfer Mankowski to the Wheaton store in particular was predicated on Mankowski's having told him that she lived in a town closer to that store than to the Schaumburg store.

Nor does Mankowski fare any better as to the single instance of a last minute three-hour extension of her work schedule. Even aside from the de minimis nature of that matter as a purported adverse employment action, Mankowski has offered no argument or evidence, or even any assertion, that the proffered reason for that change--a statement that the supervisor needed coverage that night--was pretextual.

Finally, Mankowski also fails to raise a genuine factual basis for asserting that the stated grounds for her disciplinary warning--that she had taken a personal phone call rather than helping a customer and that she had made negative comments about

the company in the customer's presence--were pretextual. To the
contrary, it has already been shown that Mankowski was well aware
that at least one of the grounds for Wearhouse's action (her
refusal to help a customer while taking a personal phone call)
was legitimate. And while Mankowski may deny that she made the
asserted negative comments, a showing of pretext requires the
plaintiff to do more than merely demonstrate that the employer
made a mistake in judgment or evaluation -- instead she must show
that the employer acted dishonestly or proffered a "phony reason"
for its action (Jordan v. Summers, 205 F.3d 337, 343 (7th Cir.
2000)).

In that respect Mankowski admits that Tate, in making his
decision to issue her a warning, had in front of him a co-
worker's complaint stating that she had made those comments, as
well as Mankowski's own admission (coupled with the co-worker's
similar statement) that she had refused to help the customer.  On
the record submitted to this Court, there is no reason to
question either the legitimacy of Tate's basis upon which to
issue the warning or the good faith with which Tate's decision
was made.

## Attorney's Fees and Costs

Wearhouse's total success on its summary judgment motion
brings to the fore its motion to recover "attorney's fees, costs
and expenses" that it incurred in defending itself--a motion

21

potentially implicating both Section 1927 and Section 5(k). What
follows here looks to both of those possible grounds for
discovery.

Section 1927 renders an attorney who "so multiplies the
proceedings in any case unreasonably and vexatiously" potentially
liable to "satisfy personally the excess costs, expenses, and
attorneys' fees reasonably incurred because of such conduct." In
fleshing out the concept of "unreasonably and vexatiously," our
Court of Appeals has framed the standard in terms of whether a
lawyer has engaged in "serious and studied disregard for the
orderly process of justice" or has pursued a claim that "is
without a plausible legal or factual basis and lacking in
justification" or has "pursue[d] a path that a reasonably careful
attorney would have known, after appropriate inquiry, to be
unsound" (see, e.g., Walter v. Fiorenzo, 840 F.2d 427, 433 (7th
Cir. 1988)). As for the Section 1927 requirement of "bad faith,"
the test is one of either subjective or objective bad faith, the
latter defined as including extremely negligent action, such as
"reckless and indifferent conduct" (Pac. Dunlop Holdings, Inc. v.
Barosh, 22 F.3d 113, 120 (7th Cir. 1994)).

Section 5(k) similarly authorizes an award of fees to a
prevailing defendant if the court finds plaintiff's "claim was
frivolous, unreasonable or groundless, or that the plaintiff
continued to litigate after it clearly became so" (Christiansburg

_Garment Co. v. EEOC_, 434 U.S. 412, 422 (1978)). And as with Section 1927, an award can be made even if the court finds no subjective bad faith on plaintiff's part (though such a finding would of course provide added support to the defendant's claim) (id. at 421-22).

Although _Christiansberg Garment_ has long since confirmed that fee-shifting onto an unsuccessful plaintiff is not at all the norm under Section 5(k)(as is the case for fee-shifting onto an unsuccessful defendant), courts have on occasion awarded fees in circumstances comparable to those that would trigger liability under Section 1927--"where the plaintiff proceeds in the face of an unambiguous adverse previous ruling" or "where a plaintiff is aware with some degree of certainty of the factual or legal infirmity of his claim" (_Badillo v. Cent. Steel & Wire Co._, 717 F.2d 1160, 1163, 1164 (7th Cir. 1983)). Lastly, by way of comparison (or more accurately by way of contrast), liability for fee awards under Section 5(k) attaches to plaintiff rather than to plaintiff's attorney (_Hines v. Abbott Realty, Inc._, No. 96 C 2465, 1998 WL 157066, at *3 (N.D. Ill. Mar. 31)).

So much then for the operative standards. But the stage is not yet set for the application of those standards, for Mankowski's counsel has not yet weighed in on the subject.

It would surely have been understandable if counsel had done so, because the shot across the bow contained in the June 27,

2005 letter from Wearhouse's counsel (and less directly, the cautionary note sounded in this Court's October 11, 2005 memorandum) certainly sounded an alert. But this Court will not fault Mankowski's counsel for not having addressed the issue in her responsive memorandum on the current motion, for Wearhouse's opening memorandum did not renew the warning given in the earlier letter--it dealt only with the substantive issues on the merits and asked only for summary judgment. Instead Wearhouse's first formal demand for fees and expenses came in its R. Mem. 10-12, at the end of the briefing timetable that this Court had established.

Any properly cautious plaintiff's counsel might well have asked at that point for leave to file a surreply memorandum, at least on the subject of sanctions. But this Court also will not penalize Mankowski or her counsel for having omitted to do so at that stage. Instead counsel is ordered to file a responsive memorandum on the subject on or before February 10, 2006. This Court will then determine whether a reply is needed or whether the issue is ripe for decision.

One final word on the subject: Deferral of the decision as to attorney's fees and expenses does not deprive the other decisions reached here of finality (Budinich v. Becton Dickinson & Co., 436 U.S. 196 (1988)). Accordingly the rulings here that have granted summary judgment trigger a final judgment of

24

dismissal of this action.

## Conclusion

There is no genuine issue of material (that is, outcome -
determinative) fact as to any element that would preserve the
viability of Mankowski's lawsuit. Wearhouse's motion for summary
judgment is granted in its entirety, and this action is
dismissed. This Court's retention of the question as to a
possible award of attorney's fees and expenses does not deprive
such dismissal of its status as a final order under Rule 54(b).[16]

_Milton I. Shadur_

Milton I. Shadur
Senior United States District Judge

Date: January 24, 2006

---

[16] All taxable costs other than attorney's fees are allowed
to Wearhouse as the prevailing party (see Rule 54(d)(1)).